UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID DAGGETT, individually, and as representative of a Class of Participants and Beneficiaries of the Waters Employee Investment Plan, | ) ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 23-11527-JGD |
| v. | ) ) ) | |
| WATERS CORPORATION, et al., | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION AND ORDER
ON DEFENDANTS' MOTION TO DISMISS**

April 18, 2024

DEIN, U.S.M.J.

## I.  <u>INTRODUCTION</u>

This case is one brought under ERISA.[1]  Plaintiff David Daggett ("Daggett") has brought

suit, individually and on behalf of a proposed class of similarly-situated participants and

beneficiaries of the Waters Employee Investment Plan, against Waters Corporation, Waters

Technologies Corporation (together, "Waters"), the Board of Directors of Waters Technologies

Corporation (the "Board"), and the Employee Benefits Administration Committee of Waters

Technologies Corporation (the "Plan Committee") (Waters, the Board, and the Plan Committee

are, collectively, the "Defendants") for Defendants' alleged breach of certain fiduciary duties

owed to the plan under ERISA.

---

[1] The Employee Retirement Income Security Act of 1974, or "ERISA," 29 U.S.C. § 1001 *et seq.*

Daggett's forty-seven (47) page "Amended Class Action Complaint" ("Am. Compl.") (Docket No. 19) brings forth four (4) counts, asserting "Breach of Duty of Prudence of ERISA" with respect to "Total RKA Fees" against the Plan Committee (Count I); "Breaches of Duty of Prudence of ERISA" with respect to "Underperforming Fidelity Freedom Fund Investments" against the Plan Committee (Count II); "Failure to Adequately Monitor Other Fiduciaries under ERISA" with respect to "Total RKA Fees" against Waters and the Board (Count III); and "Failure to Adequately Monitor Other Fiduciaries under ERISA" with respect to "Underperforming Fidelity Freedom Fund Investments" against Waters and the Board (Count IV) (Am. Compl. ¶¶ 197-235).

This matter is presently before the court on "Defendants' Motion to Dismiss the Amended Complaint" (Docket No. 23), by which the Defendants seek dismissal of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).[2, 3]  At the center of this dispute are competing interpretations of many of the same investment performance reports, plan documents, and annual disclosures that give rise to the facts of this case.  In support of their motion—and their own interpretation—the Defendants offer over three-hundred and fifty (350) pages of related exhibits.  Daggett does not dispute the authenticity of these exhibits but instead, at this early

---

[2] The original complaint in this case (Docket No. 1) was filed on July 7, 2023.  The Defendants then brought a motion to dismiss (Docket No. 14) on September 22, 2023.  While that motion was pending, Daggett filed the Amended Class Action Complaint (Docket No. 19) on October 12, 2023.  On November 15, 2023, the Defendants filed a renewed motion to dismiss (Docket No. 23), this time in response to the Amended Complaint.

[3] The court is in receipt of an *amicus curiae* brief filed by the Chamber of Commerce of the United States of America on December 21, 2023, the submission of which the court appreciates.  (See Docket Nos. 38, 39).  In its brief, the Chamber of Commerce echoes many of the same arguments raised by the Defendants, characterizing Daggett's pleaded benchmarks as providing inconclusive comparisons, labeling his allegations of imprudence as insufficient, and urging the court to follow precedent set by the out-of-circuit authorities discussed infra, in note 16.

stage, asks the court to adopt the well-pleaded allegations that support his own reading of the material.

For all the reasons detailed herein, and because Daggett's allegations, when taken together, present a plausible narrative of imprudence, the Defendants' Motion to Dismiss is DENIED for each asserted count. The Defendants' arguments, which focus on the merits of Daggett's claims, are better suited for discussion after further development of the record.

## II.  <u>STATEMENT OF FACTS</u>

The facts, as alleged in the Amended Class Action Complaint (the "Amended Complaint"), are as follows:[4]

### <u>The Parties and the Plan</u>

Waters Technologies Corporation, a subsidiary of Waters Corporation, is a corporation located in Milford, Massachusetts which manufacturers various water-based products, including lab equipment and instrumentation systems for the "research and testing of water." (Am. Compl. ¶ 36).

David Daggett, a resident of Bellingham, Massachusetts and an employee of Waters from 1984 to 2019 was, during the putative class period,[5] a participant in the Waters Employee

---

[4] When confronted with a Rule 12(b)(6) motion to dismiss, the court accepts as true "all well-pleaded facts and draw[s] all reasonable inferences" in favor of the plaintiff. <u>García-Catalán v. United States</u>, 734 F.3d 100, 102 (1st Cir. 2013) (additional citation omitted). In addition to the Amended Complaint, the court also considers those documents "sufficiently referred to" or incorporated by it. <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993). These documents, submitted as Exhibits 1-4, 7, 10-24, and 26 to the "Declaration of Benjamin S. Reilly in Support of Defendants' Motion to Dismiss the Amended Complaint" (Docket No. 25), include relevant U.S. Department of Labor Form 5500s ("Form 5500s") and select plan documents, materials which are "routinely considered on motions to dismiss in the ERISA context." <u>Velazquez v. Massachusetts Fin. Servs. Co.</u>, 320 F. Supp. 3d 252, 255 n.1 (D. Mass. 2018).

[5] The Amended Complaint defines this time period as, "July 7, 2017, through the date of judgment[.]" (Am. Compl. ¶ 15).

Investment Plan (the "Plan" or "Waters Plan"), a 401(k) retirement plan.  (Id. ¶¶ 1-2, 29-30).

Daggett remains a current participant in the Plan and, by this action, seeks to be appointed as

representative of two "Subclasses" which make up the putative class.[6]  (Id. ¶¶ 1, 31, 185).

As a "Section 401(k) 'defined contribution' pension plan" within the meaning of 29

U.S.C. § 1002(34),[7] the design of the Waters Plan allowed participants to direct the investment

of their own contributions but provided investment options and recordkeeping services that

were selected by the Plan's fiduciaries.  (Id. ¶¶ 2-3).  As fiduciaries of the Plan, Waters, through

its Board of Directors, "assigned fiduciary management and administrative duties" to the Plan

Committee.  (Id. ¶ 4).  Daggett alleges that because Waters and the Board appointed other Plan

fiduciaries to the Plan Committee, they thereby held "a concomitant fiduciary duty" to

"monitor and supervise" these appointees and, too, acted as fiduciaries of the Plan.  (Id. ¶ 37).

The Plan Committee, in turn, was the entity who administered the Plan and had the

"authority and responsibility for the control, management, and administration of the Plan" in

accordance with 29 U.S.C. § 1102(a).  (Id. ¶ 38).  Under 29 U.S.C. § 1104(a)(1)(B), the

---

[6] In particular, the two subclasses consist of: (1) "Subclass A (for RKA fees): All participants and beneficiaries of the Waters Employee Investment Plan (excluding the Defendants or any participant/ beneficiary who is a fiduciary to the Plan) beginning July 7, 2017, and running through the date of judgment"; and (2) "Subclass B (for Fidelity Freedom Funds): All participants and beneficiaries of the Waters Employee Investment Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning July 7, 2017, and running through December 31, 2022, who were at any time invested in the Fidelity Freedom Funds – Active Suite within the Plan."  (Am. Compl. ¶ 185). Combined, the two subclasses include "almost 4,000 members[.]"  (Id. ¶ 186).  Counts I and III are brought by "Plaintiff, on behalf of himself and Subclass A" (Id. ¶¶ 197, 222), and Counts II and IV are brought by "Plaintiff, on behalf of himself and Subclass B[.]" (Id. ¶¶ 208, 229).

[7] In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses."  Tibble v. Edison Int'l, 575 U.S. 523, 525, 135 S. Ct. 1823, 1826, 191 L. Ed. 2d 795 (2015).

Committee was to abide by its fiduciary duty of prudence in its administration of the Plan.  (Id. ¶ 199).

By 2021, the Plan held $1,219,718,041 ($1.219 billion) in assets and had approximately 3,983 participants.  (Id. ¶¶ 39-40).  It is alleged that, through these figures, the Plan enrolled "more participants than 99.59%" and "more assets than 99.85%" of the defined contribution plans on file in the United States for the 2021 Plan year.  (Id. ¶ 40).

## The Defendants Allegedly Breach Their Fiduciary Duties to the Plan

Despite the Plan's "tremendous bargaining power" and its purported ability to demand "low-cost administrative and well-performing, low-cost investment funds" as a result of its large size, it is alleged that the Plan Committee breached its fiduciary duty by incurring unreasonable and excessive recordkeeping and administrative—or "RKA"—fees which it paid to Fidelity,[8] the Plan's recordkeeper for more than thirteen years, and to other "non-Fidelity" service providers.[9]  (Id. ¶¶ 5-6, 15 n.1, 39).  It is alleged in the Amended Complaint that, in electing to

---

[8] The Amended Complaint describes Fidelity, a "national retirement plan services provider[][,]" or "recordkeeper[]," as "the largest of such recordkeepers."  (Am. Compl. ¶ 42).  According to Daggett, such recordkeepers provide "bundled service offerings that can meet all the needs of mega retirement plans with a prudent and materially identical level and caliber of services."  (Id.).  The Amended Complaint uses the terms "service provider" and "recordkeeper" interchangeably throughout.

"Recordkeepers help plans track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants."  Hughes v. Northwestern Univ., 595 U.S. 170, 174, 142 S. Ct. 737, 740, 211 L. Ed. 2d 558 (2022).

[9] While the Amended Complaint first uses "RKA" as a defined term for "recordkeeping and administrative [] fees" (Am. Compl. ¶ 5), it later uses the term in reference to "Retirement Plan Services" as well.  (Id. ¶¶ 41-42).  According to Daggett, there are "at least three types of RKA services provided by all recordkeepers and other service providers[,]" and these include, "Bundled RKA" services, "A La Carte services," and "Ad Hoc" services.  (Id. ¶¶ 46-47, 63, 65).  The Amended Complaint appears to allege that the Plan at issue contained all three, and that the sum of the fees paid for these services "equals the total RKA fees."  (Id. ¶ 67; see id. ¶¶ 48, 64).

retain these particular service providers, the Plan Committee failed to select a more "prudent and objectively reasonable" recordkeeper to provide total RKA services to the Plan, and that Waters and the Board breached their own fiduciary duties by failing to monitor the Committee's decision making.  (Id. ¶¶ 39, 149, 224).

Separately, Daggett alleges that the Plan Committee breached its fiduciary duty by continuing to offer the "underperforming" active suite of the Fidelity Freedom Funds (the "Active Freedom Funds") as an investment option, rather than a better-performing investment alternative, and that Waters and the Board again failed to appropriately monitor the fiduciaries they appointed to carry out these decisions.  (Id. ¶¶ 39, 215, 231).

The Amended Complaint's allegations center around these contentions, which are described in greater detail below.

<u>The Total RKA Fees Paid by the Waters Plan Were Unreasonable</u>

As a fiduciary of the Plan, the Plan Committee was responsible for choosing RKA providers that charged "objectively reasonable" total RKA fees.  (Id. ¶¶ 39, 101, 148).  Yet, by allowing the Plan to pay excessive RKA fees both to Fidelity and to other non-Fidelity recordkeepers, and by failing to remove these entities as plan service providers, the Committee allegedly breached the duty of prudence it owed the Plan under 29 U.S.C. § 1104(a)(1)(B).  (Id. ¶¶ 15, 205).

Citing plan documents and annual disclosures, Daggett asserts that the "total RKA services" paid for by the Plan were "improvident" given their "level and quality," and that a prudent fiduciary would have acted to reduce the fees paid for these services.  (Id. ¶ 20).  To this end, Daggett maintains that the "Plan Committee should have lowered its total RKA

expenses by soliciting bids from competing providers for the same RKA services and using its massive size and correspondent bargaining power to negotiate for fee rebates, but it did not do so or did so ineffectively, give[n] the excessive RKA fees paid."[10]  (Id. ¶ 6; see also ¶¶ 62, 100-01, 145-46).  Had the Plan Committee done so, Daggett alleges, it would have been able to evaluate and compare the cost of the Plan's RKA services to other options (Id. ¶ 148), to determine if the RKA fees currently being charged were reasonable in light of the services provided (Id. ¶ 89), and then use that information to "negotiate with the bidders through a competitive process" in order to achieve a "reasonable fee rate[.]"  (Id. ¶ 126).[11]

According to Daggett, the "most plausible explanation" for the "disparity" between what the Waters Plan paid in total RKA fees per participant ("pp") and what comparable plans paid "is that the Plan's fiduciaries engaged in imprudent conduct."  (Id. ¶ 122).  As a result, the Plan Committee paid "an 108% premium for what they could otherwise pay for the materially similar level and quality of total RKA services."  (Id. ¶ 138) (emphasis omitted).

With respect to these services, Daggett claims that because they are not customizable to an individual plan but rather "largely standardized" and "provided to all other mega 401(k) plan participant[s]" across the relevant market, the "quality or type of RKA services provided by compet[ing] recordkeepers are comparable to [those] provided by Fidelity and other non-

---

[10] As the Amended Complaint states, the cost of RKA services is dependent "on the number of participants, not the amount of assets in the participant's account." (Id. ¶ 44).  In a "highly competitive RKA market . . . filled with equally capable" service providers, recordkeepers will "aggressively bid to offer the best price [for their services] in an effort to win the business," particularly with "mega plans" such as the Waters Plan.  (Id. ¶¶ 60-61).

[11] According to Daggett, "[i]t is the standard of care prevailing among industry experts to solicit competitive bids every three to five years."  (Am. Compl. ¶ 90; see id. ¶¶ 70, 92).

Fidelity service providers" to the Waters Plan.  (Id. ¶¶ 56-57, 130-31).  In support of this

proposition, Daggett alleges that there are no plan documents which "suggest that there is

anything exceptional, unusual, or customized" about the RKA services provided to the Waters

Plan, and that the relevant Form 5500s and Plan fee disclosures "establish that the Plan

received no services that were materially different" than the services received by the "similarly-

sized" plans he suggests are comparable.  (Id. ¶¶ 54, 103, 142).  Therefore, in seeking to

establish that the total RKA fees paid by the Waters Plan for comparable services were

"objectively unreasonable" (Id. ¶ 101) and excessive relative to these other plans, Daggett looks

to the total RKA fee figure for each plan as "represent[ing] the best methodology" for

comparing these plans.  (Id. ¶ 68; see also id. ¶¶ 69, 104, 106-17, 123) (explaining methodology

employed).  Daggett asserts that he has engaged in "apples-to-apples comparisons[,]" but, as

detailed more fully below, the Defendants nevertheless challenge the merits of his analysis.  (Id.

¶ 105).

Daggett provides the following tables in his Amended Complaint:

**Total Retirement Plan Services (Total RKA) Fees [for Waters Plan]**

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|---|
| **Participants** | 3,415 | 3,553 | 3,693 | 3,720 | 3,983 | 3,983 | ***3,725*** |
| **Est. Total RKA Fees** | $575,883 | $381,325 | $226,272 | $430,856 | $471,023 | $471,023 | ***$426,064*** |
| **Est. Total RKA Per Participant** | $169 | $107 | $61 | $116 | $118 | $118 | ***$114*** |

(See Id. ¶ 102).[12]

_____

[12] The Amended Complaint notes that the RKA fee data listed in this table was generated "based upon information provided in 5500 Forms filed with the Department of Labor" and by the Waters Plan's "Participant Required Disclosures[.]"  (Am. Compl. ¶ 102).

**Comparable Plans' Total RKA Fees Based on Publicly Available Information – Form 5500**

(Price calculations are based on 2018 Form 5500 information)[13]

| Plan | Participants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| Genesco Salary Deferral Plan | 2,695 | $138,207 | $51 | Great-West |
| IBERIABANK Corporate Retirement Savings Plan | 3,193 | $127,723 | $40 | Prudential |
| **The Waters 2018 Plan Fee** | **3,553** | **$381,325** | **$107** | **Fidelity** |
| Associated Materials, LLC 401(K) Retirement Plan | 3,639 | $179,475 | $49 | ADP |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund | 4,369 | $185,805 | $43 | Vanguard |

(See Id. ¶ 103).

Based on the data shown in the first table, the Waters Plan paid an "effective average annual total RKA fee" of approximately $114 per participant between 2017 and 2022, with the estimated total being $107 for the 2018 plan year in particular. (Id. ¶ 102). Taking into consideration the annual total RKA fees paid by "other comparable plans of similar sizes[] receiving a materially similar level and quality of RKA services in 2018" (Id. ¶ 132), as shown in the second table at paragraph 103, and then using that data to create a "reasonable estimate of the fee rate" that other RKA service providers in the same market would have been "willing to accept in a competitive environment to provide total RKA services to the Waters Plan" (Id. ¶ 133), Daggett maintains that a "reasonable" total RKA fee for the Waters Plan for the 2018 plan

---

[13] Daggett represents that the "[r]easonable total RKA fees paid throughout the Class Period in 2018 are . . . representative of the reasonable fees during the entire Class Period." (Id. ¶ 76).

year would have instead been approximately $45 pp—not $107.  (Id. ¶¶ 132-33, 135; see id. ¶

125).

In addition to the Plan Committee, Daggett alleges that Waters and the Board also

breached their respective fiduciary duties by failing to monitor the actions of the Plan

Committee.  (Id. ¶ 8).  Specifically, it is alleged that these defendants failed to "monitor and

evaluate the performance of individuals responsible for Plan total RKA fees . . . or have a system

in place for doing so," failed to "monitor the process by which the Plan's RKA providers . . . were

evaluated[,]" failed to "investigate the availability of more reasonably-priced RKA providers[,]"

and failed to "remove [from the Plan Committee] individuals responsible for Plan total RKA

fees" despite their allegedly "inadequate" and "imprudent" performance.  (Id. ¶ 226).

As a result of the Defendants' actions (and inaction), Plan participants are alleged to

have "paid additional unnecessary operating expenses and fees" while receiving "no value" in

return.  (Id. ¶ 17).  Daggett estimates that, between 2017 through 2022, the additional cost to

Plan participants "in unreasonable and excessive total RKA fees" averaged "approximately

$221,369 per year"—or "approximately $59 per participant per year" (Id. ¶ 139)—adding up to

a "total minimum amount of approximately $1,327,297" over the same period.  (Id. ¶ 140).

Separately, he alleges that "when accounting for compounding percentages/lost market

investment opportunity" Plan participants suffered losses "in excess of $1,958,407 in total RKA

fees."  (Id. ¶ 141).

The Plan's Continued Retention of the Active Freedom Funds Was Imprudent

Separately, the Amended Complaint alleges that the Plan Committee breached its

fiduciary duty of prudence to the Plan under 29 U.S.C. § 1104(a)(1)(B) by "imprudently

maintaining the underperforming active suite of Fidelity Freedom Funds until 2022[,]" thereby costing Plan participants millions of dollars in losses during the putative class period. (Id. ¶¶ 7, 219). Specifically, by "wait[ing] inexplicably for at least twelve years" before deciding to replace the active Freedom Funds Class K and its suite of thirteen (13) target date funds ("TDFs"), with the "blended suite" of the Fidelity Freedom Funds Class R in 2022,[14] Daggett alleges that the Plan Committee "fail[ed] to remove imprudent investments within a reasonable period" and breached its "continuing and regular duty of prudence to monitor all investment options" available to Plan participants, "depriving [the Plan] participants of compounded returns[.]" (Id. ¶¶ 7, 81, 151, 177, 211, 215).

In particular, the Amended Complaint alleges that, in 2013 and 2014, the Active Freedom Funds "underwent a strategy overhaul" whereby its portfolio managers deviated from the Funds' "preset" investment trajectory and altered its "glide path allocations" such that investors—including those within the Waters Plan—faced "unnecessary risk[.]" (Id. ¶¶ 156-58). Daggett alleges that, despite these risks, Plan participants lacked any knowledge of how the performance of the Active Freedom Funds compared to "readily-available prudent alternative investments[,]" or whether any "better-performing" alternatives were available, because the Defendants failed to provide any "comparative information" which would have allowed participants to "evaluate and compare" the investment options that had been selected. (Id. ¶¶

---

[14] The Amended Complaint describes the "active suite of the Fidelity Freedom Fund Class K" as a suite of "target date funds," which it explains are "actively managed" investments that offer "an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches." (Id. ¶¶ 151-53). A target date fund's shift in asset allocation between "stocks, bonds, and cash over time" is referred to as a fund's "glide path." (Id. ¶ 153).

168-69).  Finally, Daggett alleges that Plan participants lacked any knowledge of the Plan

Committee's "process for selecting investments" or their process "for regularly monitoring

them to ensure they remained prudent."  (Id. ¶ 167).

In further support of these claims of imprudence, the Amended Complaint alleges that

during the putative class period, the Plan Committee lacked an "objectively reasonable

process" when selecting the appropriate target date fund suite for the Waters Plan, failed to

"evaluate the performance and cost of the Plan's investments critically or objectively" in

comparison to others, and would have selected a "target date fund suite with better

performance" had they "been acting prudently[.]"  (Id. ¶¶ 165-66, 216-19).  As alleged by

Daggett, one better-performing investment alternative was the American Funds Target Date

Retirement suite (the "American Funds TDF Suite"), which he offers alongside other "prudent

alternative investment option[s]" within the same investment style and category as the Active

Freedom Funds and which he describes as offering "equivalent or superior risk adjusted

returns" but "at a lower net investment cost."  (Id. ¶¶ 162-66, 172-73, 177).

Moreover, Daggett asserts that Waters and the Board, as having the "authority to

appoint and remove members" (Id. ¶ 230) on the Plan Committee, breached their own fiduciary

duties to the Plan by failing to "monitor and evaluate the performance" of individuals on the

Plan Committee responsible for investment performance or "hav[ing] a system in place for

doing so," failing to "monitor the process by which the Plan investments were evaluated[,]"

failing to "investigate the availability of better-performing funds[,]" failing to "remove

individuals responsible for Plan investment performance" from the Plan Committee, and failing

to ensure that the underperforming Active Freedom Funds were "remov[ed] at the beginning of

the Class Period[.]"  (Id. ¶¶ 8, 231-33).

As a result of the Defendants' actions (and inaction), it is alleged that Plan participants "invested in subpar investment vehicles[,]" causing "lower retirement account balances than they otherwise should have[,]" and were thereby subjected to fiduciary decisions which fell "outside the range of reasonableness."  (Id. ¶¶ 17, 22-23; see id. ¶ 183).  As alleged in the Amended Complaint, the Defendants' failure to replace the Active Freedom Funds with a better-performing investment alternative available during the same period resulted in "unreasonable and unnecessary losses" ranging "in the tens of millions of dollars."  (Id. ¶ 170).

Against this backdrop, Daggett brings this action "on behalf of the Plan" against the Defendants under 29 U.S.C. § 1132(a)(2), seeking various forms of relief in order to "make good to the Plan all losses" resulting from these alleged fiduciary breaches, to "reform the Plan to comply with ERISA[,] and to prevent further breaches of fiduciary duties[.]"  (Id. ¶¶ 24, 235).

Additional details relevant to this court's analysis are set forth below where appropriate.

### III.  ANALYSIS

#### A.  Standard of Review

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when confronted with such a motion, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.  See Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 5 (1st Cir. 2005).  Dismissal is only appropriate if the complaint, so viewed, fails to allege "a plausible entitlement to relief."  Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct.

1955, 1967, 167 L. Ed. 2d 929 (2007)).

"The plausibility inquiry necessitates a two-step pavane." García-Catalán, 734 F.3d at

103. "First, the court must distinguish 'the complaint's factual allegations (which must be

accepted as true) from its conclusory legal allegations (which need not be credited).'" Id.

(quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court

must determine whether the factual allegations are sufficient to support 'the reasonable

inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Haley v. City of

Boston, 657 F.3d 39, 46 (1st Cir. 2011)) (additional citation omitted). This second step requires

the reviewing court to "draw on its judicial experience and common sense." Id. (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)). "While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations," the plaintiff must provide "more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do[.]" Bell Atl., 550 U.S. at 555, 127 S. Ct.

at 1964-65 (citations omitted). "If the factual allegations in the complaint are too meager,

vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the

complaint is open to dismissal." Morales-Cruz, 676 F.3d at 224 (quoting SEC v. Tambone, 597

F.3d 436, 442 (1st Cir. 2010)) (additional citation omitted).

## B. An ERISA Fiduciary's Duty of Prudence – Generally

ERISA exists, in large part, to protect the interests of participants, and their

beneficiaries, in employee retirement plans. See Aetna Health Inc. v. Davila, 542 U.S. 200, 208,

124 S. Ct. 2488, 2495, 159 L. Ed. 2d 312 (2004) (citing 29 U.S.C. § 1001(b)). "[A]ny person who

exercises discretionary authority or control in the management or administration of an ERISA

[14]

plan" is, under the statute's terms, a fiduciary.  Barchock v. CVS Health Corp., 886 F.3d 43, 44

(1st Cir. 2018) (citing 29 U.S.C. § 1002(21)(A)).  As the entities charged with administering and

managing the Waters Plan, it is undisputed that the Defendants are such plan fiduciaries.

ERISA imposes on plan fiduciaries duties of loyalty and prudence, see 29 U.S.C.

§ 1104(a)(1)(A)-(B), and ERISA fiduciaries remain liable for any breach of such duties.  See 29

U.S.C. § 1109(a).  The duty of prudence, in particular, requires that "plan fiduciaries . . .

discharge their duties 'with the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters

would use in the conduct of an enterprise of a like character and with like aims.'"  Hughes, 595

U.S. at 172, 142 S. Ct. at 739 (quoting 29 U.S.C. § 1104(a)(1)(B)); see Tibble, 575 U.S. at 528, 135

S. Ct. at 1828.  In considering this duty, the First Circuit has described "[t]he test of prudence[,]"

as being "one of conduct, and not a test of the result of performance of the investment."

Barchock, 886 F.3d at 44-45 (quoting Bunch v. W.R. Grace & Co., 555 F.3d 1, 7 (1st Cir. 2009))

(alteration in original) (additional citation omitted).

To state a claim under this provision of ERISA, "plaintiffs must establish a prima facie

showing: (1) that defendants acted as the Plan's fiduciary; (2) that defendants breached their

fiduciary duties; and (3) that the breach caused a loss to the Plan."  Sellers v. Trustees of

College, 647 F. Supp. 3d 14, 23 (D. Mass. 2022) (additional citations omitted).  Such allegations

might include an ERISA fiduciary's "fail[ure] to properly monitor investments and remove

imprudent ones."  Hughes, 595 U.S. at 175, 142 S. Ct. at 741 (quoting Tibble, 575 U.S. at 530,

135 S. Ct. at 1829).

To determine "whether a fiduciary acted in accordance with its duty of prudence, a

[15]

court will evaluate conduct under the 'totality of the circumstances' and assess a fiduciary's procedures, methodology and thoroughness." <u>Sellers</u>, 647 F. Supp. 3d at 24 (citing <u>Barchock</u>, 886 F.3d at 44) (additional citations omitted).  "Whether a complaint states a claim of imprudence under ERISA is thus a necessarily context-specific inquiry." <u>Velazquez</u>, 320 F. Supp. 3d at 259.  And "[i]n factually complex ERISA cases . . . dismissal is often inappropriate." <u>Short v. Brown Univ.</u>, 320 F. Supp. 3d 363, 368 (D.R.I. 2018) (citation and quotations omitted); <u>see LaLonde v. Textron, Inc.</u>, 369 F.3d 1, 6 (1st Cir. 2004).

### C.  The Amended Complaint's Claims[15]

In crafting their arguments with respect to Count I and those counts which follow it, each party "relies on a line of fiduciary duty cases in its favor." <u>Velazquez</u>, 320 F. Supp. 3d at 258.  The Defendants place particular emphasis on a patchwork of select out-of-circuit decisions.[16]  While this court has considered these cases, it has found recent decisions issued by other sessions of this district court and other district courts within this circuit, addressing many

---

[15] The parties agree that Counts III and IV are derivative of the underlying breach claims.  Because Count III is derivative of Count I, and Count IV derivative of Count II, the court considers them out of sequence.

[16] These cases are distinguishable from the present.  <u>See</u>, <u>e.g.</u>, <u>Matney v. Barrick Gold of North America</u>, 80 F.4th 1136, 1153 (10th Cir. 2023) (breach of fiduciary duty claim was insufficiently pled where, <u>inter alia</u>, plaintiff failed to allege any information relating to the "goals or strategies" of the comparable investments he offered and therefore could not meaningfully compare these alternatives to those investments he challenged); <u>Matousek v. MidAmerican Energy Co.</u>, 51 F.4th 274, 279-80 (8th Cir. 2022) (affirming dismissal of excessive fees claim where "[r]ather than point to the fees paid by other specific, comparably sized plans," the plaintiffs had instead "rel[ied] on industry-wide averages"); <u>Albert v. Oshkosh Corp.</u>, 47 F.4th 570, 580 (7th Cir. 2022) (affirming dismissal where complaint provided insufficient context to support breach of fiduciary duty claim but nevertheless recognizing that "recordkeeping claims in a future case could survive" scrutiny on a motion to dismiss where sufficient context was provided); <u>Smith v. CommonSpirit Health</u>, 37 F.4th 1160, 1169 (6th Cir. 2022) (excessive fees claim failed where plaintiff did not plead that the services covered by her own plan's fees were equivalent to those provided by the comparable plans presented; plaintiff had used "some of the smallest plans on the market" as comparisons, plans which had potentially "fewer services and tools").

of the same issues presented here, to be more persuasive.[17]  For the reasons described herein, Defendants' Motion to Dismiss is denied.

### Count I: Breach of Duty of Prudence of ERISA
### Defendant Plan Committee – Total RKA Fees

The Amended Complaint's Allegations Allow for the Inference That the
Plan Committee's Conduct in Managing the Waters Plan Was Imprudent

In Count I, Daggett first alleges that the Plan Committee's actions were imprudent for the fact that it failed to leverage the Plan's size or conduct competitive bidding—either effectively or at all—in the recordkeeper market in order to obtain lower RKA fees.  (See Am. Compl. ¶¶ 6, 203).  In their memorandum in support of their motion to dismiss ("Defs. Mem.") (Docket No. 24), the Defendants claim that Daggett's "conclusory" allegations with respect to these claims "should be rejected as a matter of law.  (Defs. Mem. at 13-14).

As an initial matter, because ERISA fiduciaries "have a general duty to monitor recordkeeping expenses and, more generally, . . . a prudential duty to be cost-conscious in the administration of a plan[,]" they "breach their duty of prudence by failing diligently to investigate and monitor recordkeeping expenses as well as other administrative expenses."  Turner v. Schneider Elec. Holdings, Inc., 530 F. Supp. 3d 127, 136 (D. Mass. 2021) (quoting Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 213 (D. Mass. 2020)) (internal quotations omitted).  Here, the Amended

---

[17] On April 2, 2024, the Defendants filed a "Notice of Supplemental Authority" (Docket No. 44), to which Plaintiff responded (Docket No. 45), bringing to the court's attention the recent decision in Lalonde v. Mass. Mutual Ins. Co., --- F. Supp. 3d ----, Civil Action No. 22-30147-MGM, 2024 WL 1346027 (D. Mass. Mar. 29, 2024).  This case, too, is distinguishable.  See id. at *1, *8 (dismissing duty of prudence claim "restricted" by a settlement agreement reached in "a previous class action involving substantially similar allegations about the plan" where, among other reasons, plaintiff's comparison of expense ratios offered in support of her "excessive cost allegations" was "not made to a comparator fund but rather to an 'industry average'").

[17]

Complaint's allegation that the Waters Plan failed to "leverage[] its substantial size" to obtain "the materially same total RKA services for less" allows, at this stage, for an inference of imprudence. (Am. Compl. ¶ 145); see Brown v. MITRE Corp., No. 22-cv-10976-DJC, 2023 WL 2383772, at *4 (D. Mass. Mar. 6, 2023).

Furthermore, as courts within this circuit have found, a "claim that a prudent fiduciary in like circumstances would have solicited competitive bids plausibly alleges a breach of the duty of prudence." See Short, 320 F. Supp. 3d at 370 ("the Court deems unpersuasive [defendant's] point that ERISA does not per se require competitive bidding."); see also Turner, 530 F. Supp. 3d at 136-37 (allegations that fiduciary failed to conduct competitive bidding or use plan's size to negotiate lower fees were "sufficient to state a claim that [the fiduciary defendant] breached its duty of prudence regarding [the plan's service provider's] recordkeeping fees.").

In the ERISA context, a fiduciary's failure to seek competitive bids may demonstrate "a plausible breach of the duty of prudence[.]" Brown, 2023 WL 2383772, at *6 (quoting Sellers, 647 F. Supp. 3d at 26) (additional citations omitted). Daggett's inference that the Plan Committee failed to engage in competitive bidding—either effectively or at all—based upon the fact that the Plan continued to pay allegedly excessive fees over a lengthy period relative to comparable plans (see Am. Compl. ¶ 62) is not a "circular inference" as the Defendants would suggest. (Defs. Mem. at 13). Rather, it raises a viable inference at the pleading stage that the Defendants breached their duty of prudence by not seeking competitive bids. See Brown, 2023 WL 2383772, at *6 ("given that the Plans remained with the same two recordkeepers for at least fourteen years despite an alleged increase in recordkeeping costs, it is plausible that the Committee was imprudent for not conducting [a request for proposal] at reasonable intervals[.]"). After all, "in

[18]

ERISA cases, plaintiffs often lack access to all information needed to assert complete factual allegations and therefore, reasonable inferences from facts available to them are sufficient to state a claim." Sellers, 647 F. Supp. 3d at 26.

The Comparisons Made by Daggett Are Sufficient to Allow for the Inference
That the Waters Plan Paid Excessive Total RKA Fees Relative to Comparable Plans

Daggett further alleges, in support of Count I, that the Plan Committee breached its duty "by failing to employ a prudent process and by failing to evaluate the cost of the Plan's RKA services critically or objectively in comparison to other RKA provider options." (Am. Compl. ¶ 204). In response, the Defendants argue that any claim based upon alleged comparisons fails where Daggett has not put forth a "'meaningful benchmark'" showing that "similar sized plans spent less on the same services." (Defs. Mem. at 7-8 (quoting Matousek, 51 F.4th at 278)). In particular, they argue that Daggett has failed to plead any facts "concerning the precise nature, quality, or level of the services" the Plan received for the "purportedly unreasonable fees" it charged, and that the Amended Complaint's "bald assertion that all large plans receive the same services" is not one that can be relied upon. (Id. at 9-10).

However, a careful review of the detailed Amended Complaint establishes that its allegations are sufficient to state a claim. Defendants' arguments, on the other hand, ask the court to engage in a factual—and potentially expert—analysis, which is not appropriate at the motion to dismiss stage. Daggett argues, in both the Amended Complaint and in his opposition to the motion to dismiss ("Pl. Opp.") (Docket No. 37), that the Waters Plan and those of its comparable "mega" plans, received the same standardized services, with no evidence "to suggest that there is anything exceptional, unusual, or customized, about the RKA services provided to Waters Plan participants." (Am. Compl. ¶¶ 54-57; see Pl. Opp. at 8-13). He

[19]

supports this conclusion through his analysis of publicly-available plan documents for each of

the plans he uses as a comparison.  (See Am. Compl. ¶¶ 107, 110, 113, 116; see also id. ¶ 142).

He further describes his analysis and represents that the same methodology he used in

calculating the total RKA fees for the Waters Plan was used to calculate the total RKA fees for

each of the similarly situated and comparable plans.  (Id. ¶ 105; Pl. Opp. at 21-22).  Daggett has

thus put forth sufficient facts to establish that he has made an "apples-to-apples" comparison.

(Am. Compl. ¶ 105).

    In a subsequent reply ("Defs. Reply") (Docket No. 40), the Defendants take exception to

Daggett's conclusions and suggest that the RKA services provided by the Waters Plan's

recordkeepers differ "by feature or quality" from those Daggett uses as comparisons.  (Defs.

Reply at 2, 6; Defs. Mem. at 11-12).  For example, they argue, based on their own analysis of

Form 5500 materials,[18] that Daggett's calculation of fees charged to the Waters Plan takes into

consideration investment consulting services and brokerage services / account maintenance

fees, but that his calculations of the comparative plans' fees do not.  (See Defs. Mem. at 11

nn.11-12).  The result of this, the Defendants argue, is an "apples-to-oranges" comparison

whereby the total RKA fees alleged to have been paid by comparable "benchmark" plans omit

certain "categories of fees" (Defs. Reply at 6-7) considered in the calculation for the Waters

---

[18] While neither party disputes the authenticity of the exhibits provided by the Defendants, they disagree
over whether this court can consider all of them.  (See Defs. Mem. at 6 n.6; Pl. Opp. at 1 n.1).  Even
considering the majority of these exhibits, however, (see note 4, supra), they paint an incomplete picture
and are far from dispositive in resolving the factual issues the parties raise.  Further discovery and analysis
by the parties is appropriate.  See Davis v. Salesforce.com, Inc., No. 21-15867, 2022 WL 1055557, at *1 (9th
Cir. Apr. 8, 2022) (unpublished) ("[T]he judicially noticed documents on which defendants rely to support
their argument are not sufficient at the pleading stage to render plaintiffs' facially plausible allegations
inadequate.").

Plan, leaving the calculated totals for these comparator plans skewed and "artificially deflate[d][.]" (Defs. Mem. at 11, 20).

The Defendants' arguments raise factual and legal disputes which cannot be resolved at this stage. Daggett has asserted that while "some of the comparator[s] utilize different service or compensation codes for the services received on the 5500 Form, the fact remains [that] the total RKA fees are fungible and commoditized and any differences between the plans in these codes are immaterial from a pricing perspective." (Am. Compl. ¶ 131). He has provided "context-specific facts about these comparable plans" which create "a sound basis for comparison." (Pl. Opp. at 20 (internal quotation marks and citation omitted)). "To the extent [the Defendants] suggest[] otherwise, or present[] different benchmarks to measure the Plans' performance, it raises factual issues that cannot be decided at the pleading stage." Short, 320 F. Supp. 3d at 371-72 (duty of prudence claim based in part on excessive plan fees and expenses allowed to proceed where the plaintiff had alleged "specific facts" in support of their claim).

"[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund[.]" Velazquez, 320 F. Supp. 3d at 259 (quotations and citation omitted). "A claim of breach is sufficiently made out, however, when a plaintiff plausibly alleges that the higher fees were unjustified or otherwise improper." Id. And while it may be possible that "minor variations in services impact per participant recordkeeping fees[,]" (Defs. Mem. at 9 (quoting Sigetich v. Kroger Co., No. 1:21-cv-697, 2023 WL 2431667, at *9 (S.D. Ohio Mar. 9, 2023))), this is an impermissible inference at the motion to dismiss stage, where "the Court has no basis . . . 'to doubt the plausibility' of Plaintiffs' allegations" and additional details concerning the nature, quality, and scope of these services require further development of the record. See

[21]

Brown, 2023 WL 2383772, at *4, *6 (breach claim based in part on excessive fees allowed to proceed where allegations were "sufficient to infer imprudence" and court had no reason to doubt allegations that the plans at issue could have obtained the same services from other providers but for less) (additional citation omitted); but see Singh v. Deloitte LLP, 650 F. Supp. 3d 259, 267 (S.D.N.Y. 2023). As in the case here, "[t]he question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss." Short, 320 F. Supp. 3d at 37 (quotations and citation omitted).

Therefore, the motion to dismiss Count I is denied.

### Count III: Failure to Adequately Monitor Other Fiduciaries under ERISA
### Defendants Waters and Board – Total RKA Fees

In Count III of the Amended Complaint, Daggett alleges that Waters and the Board breached their fiduciary duties by failing to monitor the Plan Committee—their co-fiduciary. In particular, Daggett claims that these defendants failed to ensure that the Plan Committee and its members "were adequately performing their fiduciary obligations," and that they failed "to take prompt and effective action to protect the Plan" when these obligations went unfulfilled. (Am. Compl. ¶ 224). Under ERISA, "[i]mplicit in the power to appoint fiduciaries is the duty to monitor and 'to take action upon discovery that the appointed fiduciaries are not performing properly.'" Bowers v. Russell, --- F. Supp. 3d ---, Civil Action No. 22-10457, 2024 WL 637442, at *6 (D. Mass. Feb. 15, 2024) (quoting Kling v. Fid. Mgmt. Tr. Co., 323 F. Supp. 2d 132, 142 (D. Mass. 2004)).

Here, because "[a] claim for failure to monitor is derivative of the underlying breach[,]" and Daggett has sufficiently alleged the existence of such a breach in Count I, the derivative

failure to monitor claim also survives the motion to dismiss.  <u>Velazquez</u>, 320 F. Supp. 3d at 260

(allowing failure to monitor claim to proceed where plaintiff "sufficiently pleaded" the

underlying breach); <u>see</u> <u>Brown</u>, 2023 WL 2383772, at *8 (same).  Furthermore, "[c]ourts

generally decline to decide whether a duty to monitor has been breached on a motion to

dismiss because it is a highly fact-specific analysis."  <u>Bowers</u>, 2024 WL 637442, at *6 (allowing

failure to monitor claim to proceed where complaint "plausibly allege[d] a breach of fiduciary

duty" at motion to dismiss stage) (citation omitted).

Accordingly, the Defendants' Motion to Dismiss Count III is also denied.

### Count II: Breaches of Duty of Prudence of ERISA
### <u>Defendant Plan Committee – Underperforming Fidelity Freedom Fund Investments</u>

The Amended Complaint's Allegations Allow for the Inference That the
<u>Plan Committee Employed an Imprudent Process in Selecting Investments</u>

In Count II of the Amended Complaint, Daggett claims that the Plan Committee separately

breached its duty of prudence by neglecting to "employ a prudent process" in how it selected and

retained the investments it offered, and failing "to evaluate the performance and cost of the

Plan's investments critically or objectively in comparison to other more reasonable investment

options."  (Am. Compl. ¶ 217).  The Defendants argue that such a claim fails because the Amended

Complaint "is bereft of facts that show Defendants had a deficient process for selecting or

monitoring the funds," and that Daggett's allegations otherwise fail to state a claim.  (Defs. Mem.

at 16).  Specifically, they contend that Daggett "makes no allegations about the fiduciary process

he challenges[.]"  (<u>Id.</u>) (emphasis omitted).

While Daggett admits that he "had no knowledge of Defendants' process for selecting

investments and for regularly monitoring them" (Am. Compl. ¶ 167), "even if a plaintiff does not

[23]

'directly address' the process by which a plan is managed," a breach of fiduciary duty claim may nevertheless survive a motion to dismiss where a court "may reasonably infer from what is alleged that the process was flawed." Turner, 530 F. Supp. 3d at 133 (quoting Moreno v. Deutsche Bank Americas Holding Corp., No. 15 Civ. 9936 (LGS), 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016)). Such inferences can be drawn here. For the reasons discussed infra, the Amended Complaint has plausibly alleged that the Plan Committee retained imprudent investments for an unreasonable period of time and an "adequate investigation would have revealed" the investment's "improviden[ce]." Sellers, 647 F. Supp. 3d at 25 (additional citation omitted).

 The Amended Complaint's Allegations Allow for the Inference That the Plan Committee Acted Imprudently in Choosing to Retain the Active Freedom Funds Amidst Increasing Risk

 As Daggett acknowledges, the test of prudence is one "which focuses not on the results of an investment strategy but on the fiduciary's decision making process[,]" and so he places his focus not "on how the Fidelity Freedom Funds performed in hindsight from year-to-year" but rather on the Plan Committee's imprudent decision making in light of information which was available to them "in real-time." (Pl. Opp. at 16).

 Because the circumstances confronting a fiduciary will, "[a]t times . . . implicate difficult tradeoffs," a court "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." Hughes, 595 U.S. at 177, 142 S. Ct. at 742 (dismissal of breach of fiduciary duty claims based in part on excessive recordkeeping fees and retention of imprudent investments was erroneous). And while the prudence of a fiduciary's actions "cannot be measured in hindsight," an ERISA fiduciary "may still be held liable for assembling an imprudent menu of investment choices[,]" or by failing to remove imprudent selections from that menu. In re Biogen, Inc. ERISA Litigation, No. 20-cv-11325-DJC, 2021 WL

3116331, at *5 (D. Mass. July 22, 2021) (quoting <u>Bendaoud v. Hodgson</u>, 578 F. Supp. 2d 257, 271 (D. Mass. 2008)) (internal quotation marks and additional citation omitted).  Indeed, "[f]iduciaries have a general duty under ERISA continuously to monitor investments and remove those that are imprudent, which is a duty separate from their requirement prudently to select those investments." <u>Moitoso</u>, 451 F. Supp. 3d at 205 (citing <u>Tibble</u>, 575 U.S. at 530, 135 S. Ct. at 1829).  "[E]ven in a defined-contribution plan where participants choose their investments . . . [i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." <u>Hughes</u>, 595 U.S. at 176, 142 S. Ct. at 742 (citing <u>Tibble</u>, 575 U.S. at 529-30, 135 S. Ct. at 1828-29).  Thus, "[t]o evaluate whether a fiduciary acted prudently, specific to a fiduciary's failure to remove or close a fund, the court must consider whether the fiduciary 'fail[ed] to investigate and evaluate the merits of [their] investment decisions.'" <u>In re Biogen</u>, 2021 WL 3116331, at *5 (alteration in original) (quoting <u>DiFelice v. U.S. Airways, Inc.</u>, 497 F.3d 410, 420 (4th Cir. 2007)).  The "key question is 'whether the fiduciary took into account all relevant information' in performing its duties under ERISA." <u>Sellers</u>, 647 F. Supp. 3d at 23 (quoting <u>Turner</u>, 530 F. Supp. 3d at 133) (additional citation omitted).

Here, the Amended Complaint's claims of imprudence are reinforced not only with allegations that the Plan Committee failed "to investigate the availability" of better performing TDF alternatives but also through allegations that the Active Freedom Funds were imprudently retained in the midst of known, increasing risk.  (Pl. Opp. at 13-14).  As alleged, beginning as early as 2013 and 2014, Fidelity Freedom Fund portfolio managers began "to attempt to time market shifts to locate underpriced securities" in "a departure from . . . accepted wisdom" that "heaped further unnecessary risk" on those invested in the Active Freedom Funds.  (Am. Compl.

[25]

¶¶ 156-58).  In support of these allegations and its narrative of imprudence, the Amended

Complaint cites to a March 2018 Reuters special report on the same subject which was critical

of the funds' "history of underperformance, frequent strategy changes and rising risk[,]"

thereby suggesting that this shift in strategy and mounting risk were publicly known.[19]  (See id.

¶ 159).  Still, despite arguably known risks, the Plan Committee, as alleged by Daggett, decided

to continue to retain the Active Freedom Funds as a Plan investment option rather than act to

replace them with the American Funds TDF Suite or a more suitable alternative investment.

(See id. ¶¶ 166, 172).

    In re Biogen proves an instructive comparison.  There, the court considered many of the

same allegations of imprudence with respect to the same challenged investments at issue

here—the Active Freedom Funds.  See In re Biogen, 2021 WL 3116331, at *1.  The court held

that the "Plaintiffs' allegations support a plausible claim that a prudent person who knew what

Defendants knew would have stopped utilizing the Active suite in the aftermath of Fidelity's

strategy overhaul in 2014[,]" and that the allegations were sufficient to establish that

"Defendants plausibly knew about the 'pitfalls' of the Active suite, given its publicity[.]"  Id. at

*6.  In denying a motion to dismiss the claim that the "Defendants breached the duty of

prudence by continuing to offer the Active suite as an investment option, despite its alleged

deficiencies[,]" the Biogen court rejected the defendants' argument—also raised here—that the

---

[19] The Defendants have provided the full text of this article, dated March 5, 2018, as Exhibit 26 to the Declaration of Benjamin S. Reilly.  (See Docket No. 25-26).  The article states in relevant part, "Fidelity has seen nearly $16 billion in net withdrawals over the past four years . . . [t]he exodus stems in part from unease with the way Boston-based Fidelity has boosted performance – by ramping up risk."  (Id. at CM/ECF Page 3 of 10).  It also states that, "[o]f the top five target-date providers, Fidelity was the only one to have net withdrawals in 2016 and 2017[.]"  (Id. at CM/ECF Page 6 of 10).

plaintiffs' "factual allegations are inadequate given the Freedom Fund's historic reputation and inherent volatility[.]"  Id. at *5-6.  Like the Biogen court, in light of the allegations of the public concerns about retaining these funds, this court concludes that Daggett has "asserted sufficient factual allegations to plausibly state a claim to relief under Count [II] of [the] amended complaint with respect to Defendants' continued retention of the Active suite and declines to dismiss such claim."  Id. at *6 (and cases cited).  See also Sellers, 647 F. Supp. 3d at 32 (court denies motion to dismiss claims "that Boston College should have been on notice of the high fees and underperformance of certain Fidelity offerings, and that Boston College's failure to remove such offerings from Plan II was imprudent.").

<u>The Amended Complaint Offers Suitable Alternatives to the Challenged Investments</u>

In his Amended Complaint, Daggett further alleges that the Plan Committee breached its duty of prudence by "select[ing] and retain[ing] for years [] Plan investment options with low performance relative to other benchmark investment options" within the same investment category and style that were "readily available to the Plan at all relevant times[.]"  (Am. Compl. ¶ 218).  Specifically, Daggett alleges that:

> Defendants failed to investigate and did not prudently replace the active suite of the Fidelity Freedom Fund with the American Funds Target Date Retirement suite as an alternative prudent investment, which is a materially similarly and better performing alternative prudent investment, in the same asset category from July 2017 forward.

(Id. ¶ 172).  The failure to switch to the American Funds TDF Suite allegedly resulted in over $11,000,000 in losses to Plan participants.  (Id. ¶ 173).  In addition, Daggett lists other TDFs which he claims serve "as meaningful benchmarks for the Plan's TDF during the Class Period."  (Id. ¶ 178).  As alleged:

> [b]ased on commonly-used, quantitative performance metrics applied to investments (Sharpe ratio, alpha, and batting average), over a five year period of time, the Fidelity Freedom Fund 2025 TDF Active Suite substantially underperformed thirteen other TDFs, including the American Funds, in the exact same investment category.

(Id. ¶ 179).

The Defendants argue that such allegations with respect to investment performance "fail as a matter of law" and "fail to support any inference of imprudence." (Defs. Mem. at 16-17). Again, however, this is a fact-specific argument which requires further development of the record. While the Defendants draw the court's attention to investment reports which purportedly show that the challenged funds "continued to outperform the vast majority" of the alternative investments presented by Daggett (Defs. Mem. at 20), Daggett has nevertheless put forth evidence that publicly-available information establishes that the Active Freedom Funds underperformed when compared to "multiple alternative TDFs in the same investment category[.]" (Am. Compl. ¶¶ 174, 178 (emphasis omitted)). In addition to offering more than one investment alternative to the challenged funds, Daggett alleges that each alternative he has presented in the same investment category as the Active Freedom Funds, "satisfie[s] the same role in the same asset category" and even would have "provided equivalent or superior risk adjusted returns compared to the [Active Freedom Funds]" but "at a lower net investment cost." (Id. ¶¶ 162-64). Whether the alternatives proposed by Daggett withstand further analysis will have to be explored during discovery. Daggett's allegations are sufficient to create the sorts of comparisons called for at this juncture, as "[d]isputes over the appropriateness of these benchmarks . . . are inappropriate at the motion to dismiss stage." In re Biogen, 2021 WL 3116331, at *6 (citing Cunningham v. Cornell Univ., No. 16-cv-6525 (PKC), 2017 WL 4358769, at *7

(S.D.N.Y. Sept. 29, 2017)); see Sellers, 647 F. Supp. 3d at 30 (same).

Moreover, as courts recognize, a complaint must be read in its entirety to determine if it states a reasonable inference of imprudence.  See Sellers, 647 F. Supp. 3d at 19 (breach of fiduciary duty claims based on unreasonable recordkeeping fees and retention of imprudent investments allowed to proceed given the "totality of the pleaded facts raise[d]"); Baker v. John Hancock Life Ins. Co. (U.S.A.), No. 1:20-cv-10397-GAO, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("the cumulative effect of [plaintiffs'] allegations," with all inferences drawn in their favor, compelled the conclusion that motion to dismiss should be denied) (additional citation and quotations omitted); see also Allen v. GreatBanc Tr. Co., 835 F.3d 670, 678 (7th Cir. 2016) ("an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story.").  For all the reasons described above, the Amended Complaint's allegations when taken as a whole, support a plausible claim for a breach of duty of prudence.  Therefore, Count II will not be dismissed.

### Count IV: Failure to Adequately Monitor Other Fiduciaries Under ERISA
### Defendants Waters and Board – Underperforming Fidelity Freedom Fund Investments

In Count IV, Daggett once more alleges that Waters and the Board breached their fiduciary duties by failing to monitor the Plan Committee, but this time with respect to the Committee's actions in failing to remove the allegedly underperforming Active Freedom Funds. (See Am. Compl. ¶ 233).  For reasons identical to those stated above, because the count supporting the underlying breach claim proceeds (Count II), so too does the derivative claim in Count IV.  See Velazquez, 320 F. Supp. 3d at 260; see also Turner, 530 F. Supp. 3d at 137.

The Defendants' Motion to Dismiss is therefore denied with respect to Count IV.

[29]

### IV.  <u>CONCLUSION</u>

For all the reasons detailed herein,  the "Defendants' Motion to Dismiss the Amended

Complaint" (Docket No. 23) is DENIED.

<u>/ s / Judith Gail Dein</u>
Judith Gail Dein
United States Magistrate Judge
