1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    David Daggett, Individually   )
     and on behalf of a Class of   )
5    Participants and Beneficiaries)
     of the Waters Employee        )
6    Investment Plan,              )
                    Plaintiffs,    )
7                                  )
                                   )
8    vs.                           )    Case No. 23-cv-11527-MJJ
                                   )
9                                  )
     Waters Corporation, et al.,   )
10                  Defendant.     )

11

12   BEFORE:  The Honorable Magistrate Judge Judith G. Dein

13

14                        Motion Hearing

15

16

17                            United States District Court
                              1 Courthouse Way
18                            Boston, Massachusetts
                              February 7, 2024

19

20

21

22

23               Marianne Kusa-Ryll, RDR, CRR
                     Official Court Reporter
                  United States District Court
24                 595 Main Street, Room 514A
                   Worcester, MA 01608-2093
25               508-929-3399 justicehill@aol.com
                Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES:

 2    Jonathan M. Feigenbaum, Esquire
      184 High Street
 3    Suite 503
      Boston, Massachusetts 02110
 4    on behalf of the Plaintiffs

 5    Walcheske & Luzi LLC
      Paul M. Secunda, Esquire
 6    235 N. Executive Drive
      Suite 240
 7    Brookfield, Wisconsin 53005
      on behalf of the Plaintiffs
 8
      Goodwin Procter LLP
 9    Alison V. Douglass, Esquire
      100 Northern Avenue
10    Boston, Massachusetts 02210
      On behalf of the Defendants
11
      Goodwin Procter LLP
12    Benjamin S. Reilly, Esquire
      1900 North Street, NW
13    Washington, D.C. 20036
      on behalf of the Defendants

14

15

16

17

18              Proceedings recorded by sound recording
                and produced by computer-aided stenography
19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2           (At 10:30:40 a.m., the audio recording begins.)

3           THE CLERK:  The United States District Court for the

4    District of Massachusetts is now in session on February 7, the

5    year 2024, in the matter of Daggett versus Waters Corporation,

6    et al., Civil Action No. 2023-11527.

7           Could counsel please identify themselves for the

8    record.

9           MR. FEIGENBAUM:  Good morning, your Honor, Jonathan

10   Feigenbaum for the plaintiff.

11          THE COURT:  Good morning.

12          MR. SECUNDA:  Good morning, your Honor.  Paul Secunda

13   also for the plaintiff.

14          THE COURT:  Good morning.

15          MS. DOUGLASS:  Good morning, your Honor.  Alison

16   Douglass of Goodwin Procter for the Waters defendants, and I'm

17   joined today by my colleague Benjamin Reilly.

18          THE COURT:  Okay.  All right.  Well, we're here on the

19   defendants' motion to dismiss.

20          So who's arguing?

21          MS. DOUGLASS:  I am, your Honor.  Good morning.  And

22   thank you, your Honor, for hearing argument on our motion

23   today.  We appreciate that.  And I know there has been

24   extensive briefing on the matter.

25          I will just say at a high level, the plaintiff

1    challenges two features of the Waters 401(k) plan.

2         First, the plan's service fees, which plaintiff

3    describes as the total RKA fees in the complaint, and those

4    are -- those consist of fees for services like recordkeeping

5    for this 401(k) plan, administrative services, brokerage

6    services; there's a whole host of services that go into what

7    plaintiffs are challenging as the total RKA fees of the Waters'

8    plan.

9         Plaintiff separately challenged the plan's target date

10   funds, which is an investment option offered in the Waters'

11   401(k) plan.  Those are the Freedom funds that are managed by

12   Fidelity.

13        Now, there has been hundreds of cases like this across

14   the country in the last ten to 15 years, cases that challenge

15   the fees and investments of large 401(k) plans; and at this

16   juncture, a number of the circuit courts across the country

17   have had the opportunity to weigh in on how courts should be

18   looking at and thinking about claims such as this.

19        And, you know, there's a consensus that we feel has

20   emerged that we talk about in our briefing about how courts

21   should evaluate claims where the plaintiff alleges either that

22   the fees should have been obtained from some different service

23   provider or that a different option for investments should have

24   been offered.  And -- and that consensus is that when comparing

25   fees or investments to some alternative, the plaintiffs really

1    must be using a meaningful benchmark.

2          Now, plaintiffs acknowledge this meaningful benchmark

3    standard in their complaint.  The -- at paragraph 124 of the

4    amended complaint, plaintiffs acknowledge that that standard,

5    and that standard has been adopted by a number of courts in

6    circuits where the circuit courts have had the opportunity to

7    weigh in.

8          Now, in our motion we explain what that meaningful

9    benchmark standard means in the context of both a service fee

10   claim and an investment fee claim, and I'd like to start with

11   the service fee claim, if that's all right with your Honor.

12         THE COURT:  And I'd like you to also address the

13   standard by which I can consider all of these additional

14   pleadings -- ah, attachments.

15         MS. DOUGLASS:  Understood, your Honor.  And why don't

16   I just address that now because I do think we've contained the

17   additional materials to things that have been cited in the

18   complaint and relied on by plaintiffs.  So that would fall

19   under the standard -- I think it's cited in the *Beddall* case by

20   the First Circuit that documents that have been incorporated by

21   reference to the complaint the Court may consider on a motion

22   to dismiss.  Those documents also tend to be the kinds of

23   materials that courts will consider because they're publicly

24   available.

25         So, for example, when we get to our claim about the

1    investment fees, plaintiffs use publicly available data about

2    the mutual funds that they're challenging, those Fidelity

3    Freedom funds.  Those are data that anybody could just look up

4    online.  It's from Morningstar.  So we use those very same

5    data.  So not only is it a source that has been incorporated as

6    to the complaint, but it is publicly available.

7         THE COURT:  But publicly available doesn't limit

8    anything.  I mean, I assume there are additional publications

9    that are publicly available that would have different

10   information in them.

11        MS. DOUGLASS:  That -- that's correct, your Honor,

12   although when it comes to investment performance there -- there

13   really are no competing facts.  There's published data

14   concerning the -- the investments of those funds and their

15   performance.  So the -- the most common source is the

16   Morningstar data that plaintiffs rely on, so we've limited

17   ourselves to those data.

18        Now, when I start with the service fee claim, I want

19   to talk about what that meaningful benchmark standard means

20   when the Court thinks about what -- how -- how do we evaluate

21   what the plaintiffs have done in their complaint here, and what

22   the courts have said is that in pleading a meaningful

23   benchmark, plaintiffs must allege that some other retirement

24   plan got the same services as the Waters' plan, but got them

25   for less, and here plaintiffs don't do that.  They don't

1      list -- what they do in their complaint is they compare the

2      fees of the Waters' plan to the fees of four other plans that

3      they've identified in their complaint.

4           But what they don't do is they don't describe what the

5      Waters' plan received in terms of the nature, the quality, the

6      level of those fee -- those services, and they also don't

7      identify that for any of their comparator plans.

8           Now, I -- the way I read plaintiffs' papers is they

9      don't really dispute that they haven't provided a meaningful

10     benchmark when they identify the fees of these other four

11     plans.  Instead, they argue that the First Circuit has not yet

12     adopted this meaningful benchmark standard.

13          Now, what they say instead is -- and here's where they

14     cite, and you'll see it in their opposition brief.  They cite

15     to a decision out of this district in the *Brown versus Mitre*

16     case, where the Court held that rather than putting the burden

17     of pleading on plaintiffs to demonstrate a meaningful

18     benchmark, the onus should be on defendants to establish that

19     those benchmarks in the complaint are not meaningful.  So

20     that's a standard that I think plaintiffs are advocating.

21     Although, in fairness, they cite to the meaningful benchmark

22     standard in their complaint.

23          And so -- so relying on the District Court decision in

24     *Brown* they say, Defendants must demonstrate that their pleaded

25     benchmarks are not meaningful.  Now, respectfully, we think

1    that standard articulated in the *Brown* decision is an incorrect

2    standard.  We think it's inconsistent with Supreme Court

3    authority, for example, the *Twombly* decision that we all point

4    to on Rule 12 motions.  The *Twombly* decision says that

5    plaintiffs must plead enough facts to state a claim that is

6    plausible on its face.  The pleading burden stands squarely

7    with plaintiffs.  So we think this -- we think that standard is

8    inconsistent with *Twombly*.

9         We also think, and we know in our briefing, it's

10   inconsistent with the -- with the -- the -- the trend of

11   authority across the country for the many circuit courts that

12   have now had to deal with hundreds of these cases.

13        But importantly, your Honor, even though we feel

14   plaintiffs have not stated a meaningful benchmark, because they

15   haven't described what services Waters received, and they

16   haven't described what services the other plans received in

17   order to make any kind of a meaningful comparison, we also feel

18   that we have met in our briefing the standard that was laid out

19   in the *Brown* decision.

20        And let me just walk through that briefly, and I think

21   it's -- I think it's captured in our -- in our brief, you know,

22   in some detail, but there's just a couple of points that I'd

23   like to -- to focus on.

24        Now, one of the things that we've demonstrated is that

25   plaintiffs are comparing two different things.  In their

1    complaint, they are complaining about all of the administrative

2    and recordkeeping fees that the Waters' plan incurs, and that

3    means fees that it pays both to its recordkeeper Fidelity and

4    to all other providers that are providing these services to the

5    plan.  But when we look at their comparators, those four plans

6    that they cite, they're only comparing to the fees that those

7    plans pay to their recordkeepers and they're not capturing any

8    other fees.

9        So we think we've demonstrated there a basis under the

10    standard articulated in *Brown* for the Court to doubt the

11    plausibility of the benchmarking exercise that they have put in

12    this complaint.

13        Now, in other examples that we've shown that here

14    Fidelity, Waters' recordkeeper, provides services to the

15    Waters' plan that those other plans simply don't get.  So that

16    makes it an inapt comparison.  And a couple of examples,

17    Fidelity provides brokerage services, for example, to the

18    Waters' plan, and none of the other recordkeepers are listed in

19    the publicly available materials that plaintiff cites in his

20    complaint as providing brokerage services to those other plans.

21    So we're not seeing an apples-to-apples comparison that the

22    Court can rely on to infer that this plan somehow is paying

23    more for the same services than other plans.

24        Now, the facts that we've pointed to, and there's

25    other examples; for example, the Waters' plan has a company

1    stock fund in its -- in its 401(k) plan.  That means it's an

2    investment option where participants not only can choose from

3    mutual funds, they can invest money in a company stock fund

4    that invests in Waters' shares, shares of publicly traded

5    Waters' stock.  There's fees associated with that.  Fidelity

6    provides that service.

7         When we look at the comparable plans that plaintiff

8    has pleaded, three of those four plans don't even have such a

9    fund.  So they're surely not incurring those services and

10   they're surely not paying any fees for that.  So just another

11   example of how we're really getting kind of an apples-to-oranges

12   comparison.

13        Now, we have other examples in our briefing.  What I

14   want to know is our examples are all based on indisputable

15   facts, and I don't think plaintiff takes any issue with the

16   distinctions that we've drawn between what the Waters' plan

17   consumes in terms of services and what the other plans don't.

18        We think that that provides a basis under the *Brown*

19   decision for the Court to doubt the plausibility of

20   those -- those -- the comparability of those plans.  What

21   plaintiff does say is they don't dispute those facts, those

22   distinctions that we've made.  They say instead they're relying

23   on the allegation that all providers provide and all plans use

24   the same services, and this is an allegation that's replete in

25   their complaint and in their -- in their briefing.  They claim

1    that recordkeeping and administrative services to large plans

2    are commoditized, they're fungible, and they are the exact same

3    across all plans, and that is their purported basis for making

4    these comparisons between Waters and four other plans.

5         But we submit, your Honor, that that defies common

6    sense, frankly.  We've got five plans at issue in this

7    complaint, Waters and the four comparables.  They all use

8    different recordkeepers.  These are all large companies

9    competing in a very competitive market.  We're talking about

10   Prudential, Fidelity, Vanguard, Hewitt, Great-West, the idea

11   that they all provide identical services in terms of nature,

12   quality, and level is -- frankly, it defies common sense.  And

13   I would point your Honor to the decision, the Supreme Court

14   decision, in *Iqbal* addressing Rule 12(b) standards where the

15   court -- the court said, Courts are free to apply common sense

16   when you think about what is a plausible allegation.

17        So not only does it defy common sense that all of

18   these providers are providing the same service, we have

19   demonstrated in our briefing that they, in fact, are not

20   providing the same services.

21        THE COURT:  So it's your argument that I can make that

22   determination what from you've attached, as opposed to them

23   exploring in discovery what services are provided by each of

24   these entities?

25        MS. DOUGLASS:  Your Honor, I think you can get there

1    two ways.  You know, the first way you can get there is by

2    looking at the four corners of the complaint and saying, Have

3    plaintiffs shown me enough that I can infer that the

4    fiduciaries here were engaged in some sort of imprudent conduct

5    because at the end of the day what the Supreme Court and the

6    First Circuit have said is that under ERISA the test of

7    prudence is one of conduct, not of the ultimate result that the

8    fiduciaries get for the plan.  They're supposed to be acting

9    prudently and loyally and consistent with those duties when

10   they exercise -- when they discharge their duties.

11        And so courts have repeatedly cautioned -- this is

12   about conduct, and they're not claiming anything about -- they

13   haven't pleaded anything about what our fiduciaries do or do

14   not do.  They're simply looking at the outcome.  They're saying

15   the net fee, as we read it, is more than what another plan was

16   getting from a different provider for a different basket of

17   services, and we don't think that that gives any basis for your

18   Honor to infer any breach here.  So that's just on the four

19   corners of the complaint.

20        Now, what we have attached to our briefing is really

21   just materials that were cited in their complaint.  Again, when

22   we get to the Freedom funds case, we'll talk about the

23   performance data.  When we talk about this fee claim they, in

24   putting together their benchmarks, they relied on these forms

25   5500 that every plan files with the Department of Labor, again

1    publicly available and -- and they plead that those are the

2    bases for their allegations.

3         All we've done, your Honor, is looked at those same

4    forms and attached those forms.  They were not attached to the

5    complaint.  We've attached them to our briefing.  Courts

6    consistently -- and we've got cites in our Footnotes 1 and 2 of

7    our motion for authorities that those plan 5500s can be

8    considered on a motion to dismiss.

9         So I think there's really two ways to get there, your

10   Honor.  One is on the face of the complaint simply saying

11   another plan paid less for a different basket of services

12   doesn't provide your Honor sufficient basis to infer that these

13   fiduciaries did anything wrong.

14        I would also say if we're looking at the face of the

15   complaint, plaintiffs plead that Fidelity for its services was

16   paid $51 a head.  When we look at plaintiffs' comparators,

17   they're saying the other plans paid between 40 and 53, I think.

18   So we're right there.  You know, we're right in the mix.  Even

19   if we want to give full credit that these are apples-to-apples

20   comparisons, which they're not, they have not stated that

21   Fidelity made any more money than any other provider in a

22   comparable situation.

23        So I'm cognizant of my time, your Honor, and I'm happy

24   to move on to the -- to the Freedom fund claim.

25        THE COURT:  Fine.

1          MS. DOUGLASS:  So -- so -- well, turning to

2     plaintiffs' -- this is really the investment performance part

3     of the case, and here plaintiffs' core theory is that the

4     Freedom funds should have been removed on day one of the class

5     period, which is July 7 of 2017, and should have been replaced

6     with an alternative target date suite, which is the American

7     Funds target date funds.

8          Now, target date funds are a common feature in

9     retirement plans.  They're essentially the ability for a

10    participant to choose a fund based on their anticipated date of

11    retirement.  And so they feature heavily in retirement plans,

12    and they feature heavily in this one, and the Fidelity Freedom

13    funds, in fact, are a very popular fund.

14         Now, with respect to this part of the case, plaintiffs

15    don't seem to dispute the meaningful benchmark standard that I

16    talked about, which again courts have applied to investment

17    claims as well.  They repeatedly cite to the same authorities

18    we do as requiring that when the Court is evaluating a

19    performance claim it's important to think about is the

20    alternative a meaningful benchmark.

21         Now, courts have essentially said in the context of

22    this kind of claim, a meaningful benchmark is a fund where

23    there is a similar strategy, similar underlying holdings, and a

24    similar risk profile, right.  Again, we're looking for that

25    apples-to-apples comparison.  So if we're going to say that one

1    fund underperformed so grievously that we can infer the

2    defendants did something wrong, we need to be making an apt

3    comparison.

4         Here, in their complaint, plaintiffs really don't even

5    attempt to show that the American funds are an apt comparison.

6    They don't plead anything about their holdings, their strategy,

7    what the risk profile is and whether these American funds that

8    they claim should have been in the plan are anything like the

9    Freedom funds.

10        Instead, they just say they're in the some broad

11   Morningstar category; and again Morningstar, which reports

12   performance data for the market does categorize funds, but

13   being in the same Morningstar category means the same category

14   for all target date funds.  All target date funds are in this

15   broad category.  So it really doesn't tell you anything about

16   how the funds are managed.

17        And here's where I think the Chamber of Commerce's

18   brief was helpful.  The Chamber of Commerce pointed out to your

19   Honor that the -- the target date funds vary wildly.  Well,

20   they all have this general principle that they're managing a

21   fund to a target retirement date.  The way they -- the way they

22   develop that strategy and they execute that strategy is -- can

23   be wildly different.  So just comparing to target date funds,

24   one cannot assume that they have a similar strategy, and

25   plaintiffs here did not undertake at all to show that the

1    American funds are an apt comparator for the Fidelity Freedom

2    funds.

3            Now, the other thing I want to highlight, of course,

4    your Honor, and there has been many, many cases now about

5    target date funds in large 401(k) plans, and what the consensus

6    that has come out of those cases is that merely pointing to

7    another fund that in hindsight was a better performer can't

8    possibly state a claim because we don't charge our fiduciaries

9    under ERISA with picking the best performing fund.  There are

10   lots of considerations that go into fund consideration.  We

11   don't charge our fiduciaries under ERISA with predicting

12   performance because that would be an impossible task, and we

13   certainly don't want our fiduciaries under ERISA chasing

14   performance.  And chasing performance means, your Honor, if as

15   plaintiff would have it, you have to be in what turned out to

16   be the best performing fund at any given time, our fiduciaries

17   would have to change funds all the time.  And so rather than

18   having that menu of options that participants choose from, we

19   would be changing funds every six months, sending out notices

20   to participants who then would be confused, what do I do now.

21   Maybe I do nothing.  Maybe I don't -- won't even be in this

22   plan if they're going to change the options on me so often.

23           So it's an impracticable standard, and it is not one

24   that courts are holding fiduciaries to.  So we've noted in our

25   briefing extensively the many -- the many courts that have now

1    dismissed claims both about the Fidelity Freedom funds and

2    about other families of target date funds that are simply based

3    on the allegation that some other fund outperforms because that

4    is not the standard under the law.

5         The -- the sort of additional point that we thought

6    was very important to make in our brief is that objectively the

7    Fidelity Freedom funds actually performed very, very well

8    during this period.  So we're not really talking about funds

9    that underperformed.

10        Not only do they -- not only does their comparison to

11   the -- to the American funds not really support any inference

12   of imprudence, but what we see in the data both at plaintiffs'

13   site that the Chamber of Commerce cites and that we

14   cite -- we're all using the same data, that Morningstar data

15   that's publicly available and that courts consistently rely on,

16   we see a number of things.  And we see that the Freedom funds

17   performed very well versus their benchmark indices and their

18   peer group, and that's something we cited in the Attachment A

19   to our -- to our brief.  Attachment A is just a compilation of

20   these publicly available performance data.

21        We cite to a Reuters article that plaintiff cites

22   in -- in his own complaint at paragraph 159.  That Reuters

23   article noted that the Freedom funds were in the top 15 percent

24   of their peers in 2018.

25        How could a fund that's in the top 20 -- the top

1    15 percent of peers be a fund that has a kind of performance

2    that allows this Court to infer that there has been imprudent

3    conduct.

4           You know, we've shown in a number of different ways in

5    our briefing -- I know in the amended complaint, plaintiffs

6    added a comparison not just to the American funds.  They

7    included a chart.  I believe it's at paragraph 177 that compare

8    the 2025 vintage of the Freedom funds to a number of

9    alternatives.

10          So again these target date funds, you'll have a suite

11   of 12 funds.  It will be if you want to retire in 2025, 2030,

12   2045.  They looked at just the 2025 vintages, and they compared

13   it to twenty -- I think it was 24 or 25 options.  The Freedom

14   funds were right in the middle of the pack for that vintage.

15   Okay.  So nothing about middle-of-the-pack performance infers

16   that our fiduciaries were acting imprudently when they maintain

17   those funds.  But we did look at some of the other vintages,

18   and we found that when you look at the other vintages the other

19   vintages, in fact, performed at the top of that pack.  And the

20   reason we felt we needed to do that was because when plaintiffs

21   included their chart that adjusted the 2025 vintage, they have

22   an allegation that similar charts would exist for all of the

23   other funds, all the other vintages.

24          Well, the similar charts would not exist for the other

25   vintages because some of the other vintages, depending at where

1    they are in their strategy, were actually at the top of that

2    pack.  And we thought that was important to know.

3            So, you know, we submit that nothing about this

4    picture supports any inference of imprudence in the selection

5    and the retention of the Freedom funds and that courts

6    repeatedly caution against judging fiduciaries in hindsight.

7    They just don't get the benefit of that hindsight when

8    they're -- when they're selecting funds.  They're doing the

9    best that they can.  And these are objectively good funds that

10   have been widely used and have been retained in plans

11   and -- and we think they don't support any inference of

12   imprudence.

13           THE COURT:  Thank you.

14           MS. DOUGLASS:  Thank you, your Honor.

15           MR. SECUNDA:  Good morning, your Honor.

16           I'd like to keep my argument fairly brief by focusing

17   on the fact that we are here on a motion to dismiss, not on

18   summary judgment.  We do not want to turn our 48-page complaint

19   into a 200-page complaint.  That would serve nobody's interest.

20           I will start with a quote from Judge O'Toole, who

21   recently ruled in *Kruzell versus Clean Harbors Environmental*

22   *Services* in denying a motion to dismiss on October 3rd of 2023

23   the following.  He pointed out that because the duty of

24   prudence turns on the circumstances then prevailing at the time

25   the fiduciary acts, the appropriate inquiry will necessarily be

1    contact specific, and he cites to the *Hughes versus*
2    *Northwestern University* Supreme Court case from 2022.

3            He then goes on to say, Moreover, in considering a
4    motion to dismiss for failure to state a claim under
5    Rule 12(b)(6), a court must assume that the facts alleged by
6    the plaintiff are true and thus assumed are assessed in the
7    plaintiff's favor.  There he cites to *Garcia-Catalan*, which is
8    a First Circuit case.

9            And then finally he says, and I think this is the most
10   important thing.  He says, Consequently, quote, the combination
11   of these two principles in an ERISA context make a defendant's
12   success on a Rule 12(b)(6) motion a heavy list if not nearly
13   impossible one.  And again, that is Judge O'Toole in *Kruzell*
14   *versus Clean Harbors* from August 3rd, 2023.

15           Your Honor, what -- what I'd like to point out here is
16   that what you've heard defense counsel mainly rely upon is
17   cases outside of the First Circuit, and she must because the
18   First Circuit has a very different view on these cases than the
19   Seventh Circuit, the Sixth Circuit, the Eighth Circuit.  They
20   all have different standards.

21           In the case that has been brought to your attention,
22   *Brown versus Mitre Corp.*, which was authored by Judge Casper,
23   Judge Casper dropped a footnote, which I also think is very
24   telling.  It's only one footnote so you won't miss it.
25   Footnote 1.  It -- she wrote, Since the hearing on the pending

1    motion, the parties have submitted multiple supplemental

2    notices of authority addressing similar allegations.  As these

3    notices indicate district courts around the country have

4    adjust -- have addressed such claims with mixed results.  And

5    then she cites cases from the Southern District of New York,

6    from the Southern District of Indiana, the Western District of

7    Michigan, and the Eastern District of California.

8            Judge Casper then writes, Having considered these

9    authority, the Court finds persuasive the reasoning of the

10   other sessions of this Court, meaning the District of

11   Massachusetts, that have allowed complaints that are

12   substantially like the complaint to proceed.  And she cites the

13   *Coviello* case, 20-cv-30198; *Sellers versus the Trustees of*

14   *Boston College*, 2022, Westlaw 17968685; and *Turner versus*

15   *Schneider Electric Holdings*, which can be found at 530 F.Supp

16   3d 127, District of Massachusetts, 2021.

17           All these cases kind of go through the same analysis,

18   whether it's for recordkeeping and administrative fees, what

19   counsel calls service fees or whether we're talking about

20   investment claims like those involving the Fidelity Freedom

21   funds.

22           So another example is the case of *Norton versus*

23   *Mass. General*, which was just decided by Judge Kelley in March

24   of 2023.  The case number there is 22-cv-10045.  She points out

25   that the plaintiffs there, as we have, have alleged the plans'

1    range of fees is excessively high compared to similar funds.

2    There they listed seven similar plans.  We have four plans

3    where we've shown a variety of fees.  The average is showing

4    108 percent premium compared to the recordkeeping and

5    administrative fees that the plans are paying in this case.

6          We also allege, like the plaintiffs in *Norton*, that

7    the recordkeeping costs should have been lower because of the

8    large number of participants and the plans' greater ability to

9    negotiate for lower fees.  And we also argue that it's the

10   totality of the circumstances that points to the defendants'

11   mismanagement of the fund under ERISA.

12         And so in that case in *Norton*, under those

13   circumstances, Judge Kelley found that the plaintiffs' amended

14   complaint appropriately stated a claim.

15         Again, Judge Kelley also pointed out the same thing

16   that's kind of happening here, which is defendants are

17   highlighting cases from other circuits in which claims of a

18   breach of prudence based on excessive recordkeeping fees

19   require more precise factual allegations to demonstrate that

20   the services of the comparator plans are -- are like the plan

21   at issue.

22         Again, like Judge Casper, Judge Kelley concludes that

23   these other cases are not persuasive and that she is going to

24   follow the trend in the First Circuit in cases like *Sellers* and

25   *Turner*; a few other cases, *Short versus Brown* University, 320

1    F.Supp 3d at 363, denying the motion to dismiss in part because

2    the question whether it was imprudent to pay a particular

3    amount of recordkeeping fees generally involves questions of

4    fact that cannot be resolved on a motion to dismiss.

5            THE COURT:  Can I just ask you though --

6            MR. SECUNDA:  Yeah.

7            THE COURT:  -- do you agree that -- assuming this goes

8    forward --

9            MR. SECUNDA:  Uh-huh.

10           THE COURT:  -- that you would have to prove that

11   you're comparing this to comparable services?

12           MR. SECUNDA:  Not necessarily, your Honor.  There is

13   a -- a large information asymmetry at this part of the case.

14   We are missing some of the most important documents that we can

15   only get through discovery.  Minutes of their administrative

16   committee, for instance, will show us the actual real-time

17   fiduciary process followed.  So right now we are required to

18   make these comparisons because we don't have that direct

19   information.  So instead we must move forward by inference

20   based on the wide disparity 108 premium that we show in our

21   complaint between this plan and the comparator plans.

22           In -- in discovery, and I've done dozens of these

23   cases, we actually go and get the corporate minutes and the

24   materials to show what they did or did not do in real-time to

25   show that the fiduciary process was flawed.

1          As counsel rightly points out, we are not supposed to
2     start --
3          THE COURT:  I'm not understanding that.
4          MR. SECUNDA:  Go ahead.
5          THE COURT:  I'm not understanding so go back for me.
6          MR. SECUNDA:  Okay.
7          THE COURT:  You're alleging that this -- the fees that
8     they charged --
9          MR. SECUNDA:  Uh-huh.
10         THE COURT:  -- were excessive?
11         MR. SECUNDA:  Correct.
12         THE COURT:  Do you have to compare the services that
13    you're paying for under these Fidelity plans with similar
14    services from other plans?
15         MR. SECUNDA:  Yes, your Honor.  What we will likely
16    find when we go into discovery are a request for proposal
17    whereby the plan has asked other recordkeepers to bid for
18    providing the exact same services that Fidelity is now
19    providing.
20         This goes to our argument of these types of fees being
21    commodified and fungible.  This is not my terminology.  This is
22    terminology that has been used in the industry.  It has even
23    been admitted as we put in our complaint by Fidelity itself in
24    defending itself in the *Moitoso case versus FMR*.  So, yes, we
25    will have to go back and show that the services are exactly the

1    same that are being bid upon by the other service providers;

2    and that if they had done additional RFPs, they would have

3    received a much more competitive recordkeeping and

4    administrative fee bid.

5         Your Honor, two -- two more points, if I may.  With

6    regard to the Fidelity Freedom funds, we have a couple of cases

7    in the -- in the First Circuit that are right on point.  The

8    *Biogen* case actually involved the same exact Fidelity Freedom

9    funds, and the motion to dismiss was denied there.

10        Also more recently, *Monteiro versus the Children's*

11   *Hospital Corporation*, which is 22-cv-10069, again, Judge Kelley

12   writing for this session of the -- for a different session of

13   the Court.  She wrote, Viewed as a whole plaintiffs' complaint

14   states a plausible claim of breach of fiduciary duties.

15   Plaintiffs allege several facts in support of their claim that

16   defendants breached their fiduciary duties by offering actively

17   managed target date funds like the ones in this case, the

18   Fidelity Freedom funds.  They make a comparison to a different

19   target date fund.  They did a different comparison in that

20   case, but we use the American fund, which is the top in the

21   class.  They also offered that there was information of

22   underperformance by describing various articles that were

23   critical of the Active Suite and by noting net outflows from

24   the Active Suite to other investments.  This is where they cite

25   to *In re: Biogen*, which is 2021 WL 3116331.

1          Plaintiffs also allege defendant -- defendants allowed

2    recordkeeping and administrative fees that far exceeded the

3    reasonable market rate listing the average per person fees paid

4    by other similarly sized and comparable defined contribution

5    accounts and she said, Taking into account the totality of the

6    circumstances, plaintiffs have pleaded sufficient factual

7    allegations to state a plausible claim against defendants for

8    breach of the duty of prudence as reasonable -- as unreasonable

9    fees and imprudent investment options.

10          So they -- they cite to the *Sellers* case again, and

11    also again point out that defendants' alternative explanations,

12    including meaningful benchmarks, are kind of what is required

13    in other circuits, but not here in the First Circuit.

14          The last thing I'll make mention to the Court and one

15    that you have brought up a couple of times, your Honor, is this

16    tremendous amount of additional materials that have been added

17    to a motion to dismiss.  We have, of course, dropped a footnote

18    on that.  We thought about filing a motion to strike, but we

19    think the -- the law is pretty clear here that you can only

20    have documents outside the pleading, not that they're just

21    public, of course, but they have to be cited or a part of the

22    complaint.  None of these Morningstar reports are part of our

23    allegations, and I would ask the Court to review our complaint

24    in detail to -- to see that's the case.

25          Certainly we say they're in the same Morningstar

1    assets and categories are involved, but we don't go into, for

2    instance, the annual returns for the period of 2017 through

3    2022.  We don't get into one-year returns or three-year returns

4    or five-year returns, we're not suggesting that these documents

5    are not authentic.  They are probably authentic, but with this

6    type of data the underlying materials are subject to reasonable

7    different interpretations of the facts that are contained in

8    these documents; and therefore, we would ask that they not be

9    considered by the Court, that the Court limit itself to the

10   four corners of the complaint.  And clearly under the multitude

11   of the First Circuit and District Court of Massachusetts

12   authority that I have just cited we believe that the motion to

13   dismiss should be denied in its entirety.

14          THE COURT:  If you needed discovery, how --

15   what -- what would your discovery plan sort of look like as a

16   timeline?

17          MR. SECUNDA:  I would think, your Honor, based on

18   having done these cases in the past, 18 months is reasonable,

19   and the reason is is because what we generally do is we take

20   the depositions of the plaintiffs.  They take the depositions

21   of the plaintiff.  I then take a deposition of those who are on

22   the investment committee.  That usually takes three or four

23   months along with the exchange of interrogatories, document

24   requests, admissions, so forth.

25          We then have a separate period where we deal with the

1    experts.  Usually there's a lot of experts in this case looking

2    at both recordkeeping fees, investment fees, the fiduciary

3    process that needs to be filed.  So each side might have three

4    or so experts.  That takes another two to three months.

5         So by the time all is said and done, I would think

6    discovery would go towards the fall of this year being ended

7    and then filing for summary judgment motions by both sides if

8    applicable.

9         Also, your Honor, we are required to file a class

10   certification motion, which will be an injunctive class under

11   23(b)(1), so that will be part of the discovery process as

12   well.

13        I would -- I would hope, your Honor, that we could

14   hold a trial in this case in the first quarter of 2025.

15        THE COURT:  Okay.  No surprise it won't involve me.

16   My term expires July 30th.

17        MR. SECUNDA:  Okay.  Would you like to hold the --

18        THE COURT:  We can --

19        MR. SECUNDA:  -- trial?

20        THE COURT:  I'll be happy to schedule this for

21   somebody else.

22        MR. SECUNDA:  Okay.  Thank you, your Honor.

23        Anything else, your Honor?

24        THE COURT:  Huh?

25        MR. SECUNDA:  Anything else?

1          THE COURT:  No.

2          MR. SECUNDA:  Okay.

3          THE COURT:  Let me hear from Ms. Douglass.

4          MS. DOUGLASS:  Your Honor, if I may just address a

5     couple of points my brother made.

6          First, with respect to the information asymmetry, I

7     will note that plaintiff does not say in either his complaint

8     or his brief that he lacks information about our fiduciary

9     process; and to be sure the dis -- the discovery would be

10    voluminous if he were to explore what he proposes to explore,

11    but he doesn't say in his complaint or his brief that he lacks

12    any information.  He says the opposite.  He says we don't need

13    any information because all providers provide the same services

14    and all plans use the same services.

15         So the idea that there -- that more information

16    outside the complaint is needed, it does not dovetail with how

17    the claim has been pleaded, and we submit that on the face of

18    the complaint that's not a plausible allegation.

19         But also with respect to his information as asymmetry.

20    That is always the case.  That is always the case employees at

21    companies don't know exactly what those in-house committees

22    that manage benefit plans are doing on a day-to-day basis.

23    They don't get to read the minutes of the meetings.  And the

24    DOL has issued very specific and prescriptive rules about what

25    participants do need to be told, and they need to be told about

1    the fees, and they need to be told about the investments.  And

2    that includes the investment strategy, the investment

3    performance, and what the investment benchmark is.

4         So participants here, including Mr. Daggett, have

5    received exactly the information that the law requires.

6         If -- if we were to say a case gets past a motion to

7    dismiss because of information asymmetry, every case would get

8    past a motion to dismiss and every plan in this country would

9    be in a constant state of litigation.  So that can't possibly

10   be the standard.

11        Plaintiff noted the -- made a reference to something

12   in their complaint, which I want to address, which was a -- I

13   think the argument was that Fidelity stipulated in a litigation

14   about its own plan that services are commoditized.  And I want

15   to be clear, that is not what that stipulation stated.  Now,

16   plaintiff cites to a stipulation.  It was a discovery

17   stipulation in the litigation here in the District of

18   Massachusetts where Fidelity was sued about the services it

19   provides to its own plan, it record keeps its own Fidelity

20   401(k) plan.  And the suit was about those services and those

21   fees.  And for purposes of resolving a discovery dispute, they

22   did what many litigating parties do, they entered into a

23   discovery stipulation that said, We stipulate that the value of

24   services that this plan got was X.  That stipulation doesn't

25   say anything about any other plan, and it certainly doesn't say

1    anything about the Waters' plan, and it certainly doesn't say

2    that it provides commoditized services.

3          We're talking about a sophisticated recordkeeper who

4    differentiates itself on service and quality, and it certainly

5    did not stipulate that it provides commoditized services.

6          And then, you know, with respect to the numerous

7    authorities, I don't dispute any of the authorities that my

8    brother cites.  There have been cases coming out by the week

9    that we could have submitted to your Honor; some they're

10   losing, some they're winning, right.  So we have complaints

11   that are being dismissed, and complaints are going into

12   discovery.

13         What I think we're seeing is that it has been helpful

14   across the country for circuit courts to weigh in.  And now

15   we've got have the Seventh, the Eighth, the Sixth, and the

16   Tenth Circuits have all weighed in and provided guidance

17   regarding how courts should look at this.  And one of my

18   takeaways from the authorities that my brother reads is that it

19   would be helpful to get insight from the First Circuit.  We do

20   have some insight from the First Circuit, and I would encourage

21   the Court to revisit the *Barchock versus CVS* case that was

22   decided in 2018 by the First Circuit.  That was a case

23   concerning 401(k) plans and the pleading standards for prudence

24   claims.  The cite is 886 F.3d 43.

25         In the *Barchock* case the plaintiffs were challenging

1    an investment in a plan, and they were claiming that it was not

2    managed as well as some alternative.  They were essentially

3    saying it was underperforming.  It should have been invested

4    differently or the plan should have offered something

5    different, and the First Circuit did get to weigh in on

6    pleading standards and affirmed the dismissal of a complaint,

7    and it said important things.  It said the test of prudence is

8    one of conduct and not about the performance of an investment.

9    It said whether futures actions approved cannot be determined

10   in hindsight.  And it talked about the context, right, so my

11   brother referenced context, and all of the courts now talk

12   about what is the context in which these claims need to be

13   evaluated.

14          Well, the First Circuit looked at context.  It looked

15   at the context that was pleaded in that case is how are other

16   funds invested; what are other fiduciaries offering; what are

17   other fiduciaries doing.  And what the First Circuit said is

18   that even if the strategy chosen by these defendants was the

19   path less traveled that doesn't provide any basis to infer

20   imprudence.

21          So here at most, they're saying there's one other fund

22   that outperformed, and some other fiduciaries chose that.  That

23   doesn't mean you can infer imprudence even if we were the path

24   less traveled.  And to be the sure the Fidelity Freedom funds

25   were generally the most popular funds was not the path less

1    traveled.  Even if with respect to the service fee claim they

2    have plausibly alleged that four other plans paid a little bit

3    less.

4            Even if we're the path less traveled by paying a

5    little bit more for better services, for more services, for

6    those services related to brokerage that I mentioned, for the

7    services related to the company's stock fund that I mentioned,

8    that does not put us on the path less traveled, but even if it

9    does the First Circuit has said different fiduciaries make

10   different choices.

11           So I would encourage the Court to read this *Barchock*

12   decision.  And with that unless there's other questions for me

13   I'll rest.

14           THE COURT:  Okay.

15           MS. DOUGLASS:  Thank you, your Honor.

16           THE COURT:  Thank you.

17           I will decide this motion.  I can't figure out how to

18   pass that off on to somebody else.  So I will decide the

19   motion.  This has been very helpful.

20           Thank you.

21           MS. DOUGLASS:  Thank you, your Honor.

22           MR. SECUNDA:  Thank you, your Honor.

23           THE CLERK:  Court is in recess.

24           (At 11:23:16 a.m., the audio recording ended.)

25

1                    C E R T I F I C A T E

2

3           I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription prepared to the best of my skill, knowledge, and

6    ability from the official electronic sound recording of the

7    proceedings before Magistrate Judge Judith Dein in the

8    above-entitled matter.

9

10

11      /s/ Marianne Kusa-Ryll            _____07-10-24__
        Marianne Kusa-Ryll, RDR, CRR               Date
12      Federal Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25